### MORRIS v. MORRIS et al.

(Supreme Court, Appellate Division, Third Department. June 27, 1906.)

ADVERSE POSSESSION—EVIDENCE.

> L., under whom both parties claimed, died in 1875 seised of the tract of land in question and another farm of 80 acres. In 1859 a new house had been built on the property in question by L.'s son J., who had the principal management and control of the household. Prior to this time L. had formed and stated his intention to give such property to J., who used and occupied the land in the same way until 1884, when the house was burned. In order to obtain the insurance money, J. was required to obtain the assent of the other heirs, which was given. Since 1868 the land had been assessed to J., and he had had the entire control and management thereof. A large three-story boarding house was then constructed thereon for the accommodation of summer boarders. Prior to suit brought to partition the land, J. and all the other heirs but one had quitclaimed their interest in the 80 acres. *Held*, that such facts were sufficient to establish J.'s title to the land in controversy by adverse possession.
>
> Chester, J., dissenting.

Appeal from Special Term.

Partition by George B. Morris against Mary E. Morris and others. From a judgment for plaintiff, defendants appeal. Reversed. New trial ordered.

Argued before SMITH, CHESTER, KELLOGG, and COCHRANE, JJ.

John D. Lyon and George H. Smith, for appellants.
John R. De Vany and T. F. Bush, for respondent.

JOHN M. KELLOGG, J. John Lynch, who died in 1875, formerly owned the 100 acres of land in question, and another farm of 80 acres near it. He was about 80 years of age at the time of his death, and had been a sufferer from rheumatism and not been able to do any work except chores around for many years. His children were Barney, John T. Lynch, Mary Ellen Lynch, Catherine Morris, and James Lynch. The latter died unmarried and intestate in 1899. John Lynch and his family resided upon the 100 acres, and occupied the 80 acres with it, and in 1859 a new house was built upon the 100 acres by John T. Lynch, who at that time had the principal management and control of the property and was the business man of the household. Prior to the time of the building of this house, the father had formed the intention and had stated that his son John T. was to have the 100 acres, and his son Barney the 80 acres, and that each of the daughters was to have $300;

that he was old and infirm, and was through work. The daughters married and left home, Barney and John living upon the place, and brought their wives there, and a new house was built upon the 80 acres, and Barney moved upon it, and for about 33 years before the trial he occupied the 80 acres, claiming to be and was recognized as the owner thereof. John T. used and occupied the 100 acres in substantially the same way. In 1883 or 1884 the house then upon the 100 acres burned, and John T., in order to obtain the insurance money, which was from $1,000 to $1,300, was required by the company to obtain from the heirs an assent that the money be paid to him. He obtained this assent, stating that he was to use the money in building a new house. The wife of John lived with John T. until her death in 1887, and Jane, the unmarried sister, lived with him until her death in 1889; she saying that she did not want the $300 paid to her, but preferred to live with John T. The $300 was paid to Mary Ellen Lynch at about or soon after the time of the agreement about the property. Catherine Morris, the mother of the plaintiff and of some of the defendants, lived upon an adjoining farm, about a mile distant from the farm occupied by her brother John T., and her husband, Francis Morris, carried on his farm and blacksmith shop. Since 1868 the 100 acres was assessed to John T., and he has had the entire control and management and avails of it. The farm is a poor farm, not of great value for agricultural purposes, and with the house which was built upon it in 1859 and the buildings as they then stood, if in proper condition, would now be worth about $3,000. Property in the locality where this is situate is in great demand for keeping summer boarders, and the new house built by John T. upon this farm is a large three-story boarding house, with accommodations for 60 guests, having a large wagon house and stable and a stone ice house, and the property as it now is worth about $10,000. This increase of $7,000 in the value of the property arises entirely from the improvements put upon it by John T., and which cost him more than that sum, and the property is now valuable and useful, and with other property in that locality is valuable and useful principally for carrying on the business of keeping summer boarders. Catherine Morris died in 1896. She and her husband and her family saw all of the improvements being made, knew the manner in which the property was being carried on, and that John T. was assuming to be, and was understood to be, the owner of it. The evidence tends to show that Mrs. Morris admitted to her sisters, and it was understood in the family, that she had received her $300 the same as her sisters, and the evidence fairly shows such payment. Three or four years before this action was brought Barney was desirous of selling his 80 acres, and it was then discovered that his record title was imperfect, and John T. Lynch quitclaimed to him his interest in the 80 acres, and he quitclaimed to John T. his interest in the 100 acres. The other members of the family quitclaimed to Barney without compensation except Francis B. Morris, the husband of said Catherine, who insisted that John Lynch owed him an old blacksmill bill, which, with interest, amounted to from $100 to $200, and that his family would quitclaim upon receiving $150, and a quitclaim was executed accordingly; Barney paying $75 and John T. $75. It does not

appear that the Morrises then claimed that Barney must pay for the land, or denied his ownership. If the Morrises had an interest in the 80 acres it was worth more than $150, but the $150 was exacted upon the claim that it was for a personal debt due from John Lynch to Mr. Morris. Mrs. Mary Ellen Lynch quitclaimed to John T. without consideration. John T. Lynch died in possession of the farm a few months before this action was brought, and Barney died about the same time. It does not appear that the heirs of Catherine Morris, or any of the other heirs of John Lynch, ever claimed any interest in these farms occupied by Barney and John T. until after the death of Barney and John T. The findings of the court do not give us much satisfaction as to the grounds upon which its decision was placed. It simply finds the ownership in John and the relationship of the various parties, and directs a partition of the 100 acres. There are no findings upon the alleged adverse possession of John T. and his family of the 100 acres, nor as to the agreement or partition of his property by John Lynch among his children, or the effect of it, so that we cannot tell whether the court found the facts in favor of the family of John T. Lynch, and decided the law adversely to them, or whether the decision went against them on the facts.

It seems clear that the family of Catherine Morris have no interest in the 100 acres of land. If she was interested in that property, it would seem that she would not have lived on an adjoining farm from the death of her father in 1875 to her death in 1896, seeing her brother making the improvements and occupying the farm as owner, and assert no claim in hostility to him. Neither does it seem that the same course would have been taken with reference to the 80 acres owned by Barney, or that the quitclaim to Barney would have been executed simply in consideration of an old debt. The criticism is made that the evidence as to the agreement is given by old people, who do not give the full details of the contract, and that the proof is unsatisfactory to show the contract. But the strongest evidence in this case is the long lapse of time and the action of the parties themselves. All the parties to the original transaction are dead, and Mary Ellen Lynch, the surviving sister, swears to the general understanding and knowledge in the family, and the criticism may fairly be made that what she says does not arise to the full dignity of a contract. But after the parties had carried out for over 30 years such a family arrangement or understanding, it is not necessary to establish every detail of it against parties whose conduct shows that there was in fact such a transaction. Francis Morris, the surviving husband of Catherine, denies that Catherine received the cattle which Mary Ellen Lynch says were paid to her for her interest in the property, but he does not state any fact explaining the silence of his family for this long period of time, nor does he deny that it was the understanding in the family that an arrangement was made, and that it was the understanding that John T. owned the property. Without any attempt to explain the possession, the extensive building operations, and the large improvements upon this property for the long period of time, and with Catherine Morris and her family living upon an adjoining farm, the concluson is almost irresistible that she knew that she had no interest in this farm, and that her husband had the same knowledge. All the circumstances

tend to show that John T. Lynch and his family have occupied this property as owners, and claiming to be the owners, since 1875, and in fact before that date, and that Catherine Morris and her family knew of such occupancy, of the extensive improvements being made by him, and of his acts of ownership and his assertion of title. It is not necessary, therefore, to find an agreement so definite in terms that a specific performance of it may be decreed. The possession was under the agreement or understanding, if we do not call it an agreement, and the continued acts of ownership by John T. Lynch are such that the heirs of Catherine Lynch are barred by the statute of limitations from maintaining any action to recover any interest in this property.

This case well illustrates the necessity of a statute of limitations, a law of repose, and the propriety of the rule that after parties have slept upon their rights or have recognized a situation for so long a time that they cannot awake, after all the parties who knew the facts are dead, and then assert and maintain a claim which is entirely inconsistent with the history of all their lives. This is one of those cases where the law may well presume, if necessary, that John T. Lynch had a grant of the property; but this is unnecessary, for the reason that the occupancy and the manner in which the property has been used with the knowledge of all concerned precludes the disturbance of his title to the property. The plaintiff, therefore, has no right to maintain an action for the partition of the property in question. The judgment is therefore reversed, and a new trial ordered, with costs to the appellants to abide the event. All concur, except CHESTER, J., who dissents.